1           UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
2           NORTHERN DIVISION AT COVINGTON

3

  UNITED STATES OF AMERICA,
4
        Plaintiff,              Docket No. 2:22-CR-51
5                               At Covington, Kentucky
                                Tuesday, July 26, 2022
6                               1:13:47 a.m.

7  ANTHONY MARIO WYNN,
                                ***Via Electronic Recording***
8
        Defendant.
9
                        - - -
10

11     TRANSCRIPT OF PRELIMINARY HEARING PROCEEDINGS
        BEFORE U.S. MAGISTRATE CANDACE J. SMITH
        #KYED-COV_2-22-MJ-2550-CJS_20220726_131313
12
                        - - -
13

   APPEARANCES:
14
   For the United         ANTHONY J. BRACKE
15  States:               Assistant United States Attorney
                          207 Grandview Drive
16                        Suite 400
                          Ft. Mitchell, Kentucky  41017-2762
17                        (859) 652-7032

18  For the Defendant:    KERRY L. NEFF
                          526 Greenup Street
19                        Covington, Kentucky  41011
                          (859) 291-6333
20
    Transcriber:          SANDRA L. WILDER, RMR, CRR
21                        Official Court Reporter
                          313 John C. Watts Federal Building
22                        330 West Broadway, Suite 327
                          Frankfort, Kentucky  40601
23

24        Proceedings recorded by digital recording,
       transcript produced by transcriber.
25

```
 1              [Proceedings commenced at 1:13:47 p.m. in
 2  open court]
 3              THE COURT:  All right.  Good afternoon,
 4  everyone.
 5              Madam Clerk, would you call the matter set
 6  for a combined preliminary and detention hearing,
 7  please.
 8              COURTROOM DEPUTY:  Covington Magistrate
 9  22-2550, United States versus Anthony Mario Wynn.
10              THE COURT:  Thank you.
11              Let's have the attorneys enter their
12  appearances, please.
13              MR. BRACKE:  Tony Bracke for the United
14  States.
15              Agent Jeff Price from ATF is assisting me
16  today, Your Honor.
17              THE COURT:  Thank you, Mr. Bracke.
18              MR. NEFF:  Judge, good afternoon.  Kerry Neff
19  here with Mr. Wynn, who's seated to my right.
20              THE COURT:  Thank you, Mr. Neff.
21              And the Court does recognize Mr. Wynn here
22  today as well.
23              All right.  Mr. Wynn, we have this case set
24  down for a combined preliminary and detention hearing.
25              And before we get to the details of that, I
```

1 have received also a pretrial services report.  This

2 was prepared based upon the interview that was done of

3 you.  Let me go ahead and turn to that first.

4          Mr. Neff, did you receive a copy of that?

5          MR. NEFF:  Judge, I, I do have a copy.  And

6 if I may just interject something here.

7          THE COURT:  Sure.

8          MR. NEFF:  I went over on, I think, Friday,

9 Friday or Saturday and met with Mr. Wynn at the

10 Campbell County detention center, and we began the

11 process of reviewing this report.

12          There's so much information in here that he

13 disagrees with.  I'm going to ask the Court to allow

14 me to continue the detention hearing so that I can

15 either verify or, or dispute the information that's in

16 here.

17          THE COURT:  Okay.

18          MR. NEFF:  And that way, I'll be in a

19 position where I can tell the Court my client believes

20 the report is accurate.

21          THE COURT:  I see.

22          MR. NEFF:  I can't do that right now.

23          THE COURT:  Okay.

24          MR. NEFF:  I -- everything that he disagrees

25 with, I think I should be able to either verify or

1  dispute and show him where the information came from.

2  So I --

3       THE COURT:  But you're going to need some

4  additional time to work through that?

5       MR. NEFF:  I will, Your Honor.  I'll need to

6  collect some records.  He already has some that I need

7  to look at.

8       THE COURT:  Okay.

9       MR. NEFF:  So what I would like to ask the

10 Court to do is let us proceed with the preliminary

11 hearing, and let me continue the detention hearing

12 until a further date.

13      THE COURT:  Okay.  All right.

14      MR. NEFF:  Thank you.

15      THE COURT:  No, that's fine.  That's fine.  I

16 appreciate that information, Mr. Neff, and so we'll go

17 ahead and turn to the preliminary hearing portion of

18 our proceeding then.

19      Now, Mr. Wynn, when you were in front of me

20 last time, we did review the criminal complaint.  You

21 are currently charged in a criminal complaint.

22      And I think one of the things that came up at

23 that last proceeding -- and now I'm realizing I think

24 neither one of you were here for that.  Ms. Rafizadeh

25 and someone else was covering for you, Mr. Bracke.

1   I -- let's see here.  Mr. Spivak was here for you.

2           It, it did come to my attention, Mr. Wynn,

3   when we were reviewing the criminal complaint.  As you

4   know, there are three charges that are listed on that

5   criminal complaint as far as what you are charged with

6   by way of criminal complaint, so I had started to go

7   over the penalties with you.  And I did indicate that

8   I thought that there was a correction that was needed

9   with respect to the potential penalties when someone

10  is convicted of a violation of 21 United States Code,

11  Section 841(a)(1), which is the federal statute that

12  deals with distribution of controlled substances.

13          And, Mr. Bracke, it looks like I have a, a

14  new penalty page here at the bench.

15          MR. BRACKE:  Yes, judge.  We -- I caught the

16  error after Mr. Spivak pointed out what had been done,

17  and the error was my fault.

18          I prepared a corrected penalty page.  I

19  tendered it to the clerk before the proceeding.  I'd

20  also tendered copies for both Mr. Wynn and Mr. Neff --

21          THE COURT:  Great.

22          MR. BRACKE:  -- before, before we began our

23  proceeding so that he would know the United States'

24  position very clearly is the penalty for that, that

25  offense for a first offense is not more than 20 years

1 imprisonment; if it's a prior drug felony, not more

2 than 30 years imprisonment.  That particular charge

3 does not carry a mandatory minimum sentence.

4        THE COURT:  Gotcha'.  Thank you, Mr. Bracke.

5 I do appreciate that clarification by the government.

6 That is also consistent with afterward my going back

7 and checking the statute as well.

8        So I just want to confirm for purposes of the

9 record, Mr. Neff, you did receive that amended or

10 corrected penalty sheet, and you and Mr. Wynn have had

11 a chance to look at that?

12        MR. NEFF:  I do have a copy.  We both have

13 copies, and we did look at it.

14        And, judge, when I was meeting with Mr. Wynn

15 at the detention center on the 841(a)(1) charge, I --

16 just based on what's in the affidavit and the

17 complaint, I did advise him that I did not think there

18 was a mandatory minimum based on that drug and that

19 weight.

20        THE COURT:  Right.

21        MR. NEFF:  This kind of reflects what we

22 talked about.

23        THE COURT:  Okay.

24        MR. NEFF:  Thank you.

25        THE COURT:  Okay.  Good.

1          So the main difference there, Mr. Wynn, under

2   the first penalty page that we were looking at, it

3   said not less than 20 years, and so that's sometimes

4   referred to here federally as a mandatory minimum when

5   something is not less than something.

6          But under the penalty statute for a

7   controlled substance charge, such as what is alleged

8   in this criminal complaint against you, sir, instead

9   of not less than 20 years, it's not more than 20

10  years.  So the 20 years is the maximum that the Court

11  could consider, if you were convicted and if the judge

12  needed to sentence you.

13         So that is the -- that wording change

14  obviously is significant for you.  So I do want the

15  record to reflect that we have gone over that and that

16  you have been provided with that amended penalty page.

17         Everything else I told you at the initial

18  proceeding as far as this being a criminal complaint,

19  you having a right to a preliminary hearing, that --

20  which we're going to conduct now.

21         If the Court finds probable cause at the

22  conclusion of the preliminary hearing, that would

23  still mean, though, that it has to be bound over to

24  the grand jury.

25         Okay.  All right.  Looks like, gentlemen, we

1  are ready to get started with the preliminary hearing.

2         And so, Mr. Bracke, would you like to call

3  your first witness, please.

4         MR. BRACKE:  The United States calls Agent

5  Jeffrey Price.

6         THE COURT:  Thank you.  And if you will step

7  forward, please, to be sworn by the clerk.

8         COURTROOM DEPUTY:  Would you raise your right

9  hand.

10        [The Witness Jeffrey Price was sworn]

11        MR. BRACKE:  Judge, I know this is a recorded

12 proceeding.  Do you prefer we stay at table or go to

13 the podium?

14        THE COURT:  I -- stay at the podium for now.

15 The last word I had -- I'll have to check on it -- I

16 don't think the microphone at the podium is currently

17 working, so ...

18        MR. BRACKE:  Stay here?

19        THE COURT:  Yes, so stay at the table.  Thank

20 you.

21        MR. BRACKE:  Yes, Your Honor.

22                    DIRECT EXAMINATION

23    BY:  MR. BRACKE:

24    Q.    Would you identify yourself, and go ahead

25 and spell your last name for the record.

1    A.     My name's Jeff Price.  I'm a special agent

2 with ATF.  Last name's spelled P-R-I-C-E.

3    Q.     And how long have you been in law

4 enforcement?

5    A.     I've been in law enforcement since

6 September 2011.

7    Q.     Okay.  And since September 2011, can you

8 give the Court an idea as to what, what specialized

9 assignments related to narcotics that you've had

10 during your history and experience.

11    A.     I initially was a patrol office for the

12 Kenton County police department, and then transitioned

13 to being an agent with the Northern Kentucky Drug

14 Strike Force investigating drug trafficking crimes.

15       Then became a task force officer with the ATF

16 investigating both firearm and drug-related crimes.

17       Then in March of 2020, was hired by the ATF

18 as a special agent, and continued investigating

19 primarily firearms and drug-related crimes.

20    Q.     When did you begin working with the

21 Northern Kentucky Drug Strike Force?

22    A.     In 2016.

23    Q.     So you've had more than five years

24 experience focusing on drug crimes, among other

25 offenses?

1     A.      Correct.

2     Q.      Okay.  In that capacity, have you

3  participated in an investigation of Anthony -- of

4  Anthony Mario Wynn?

5     A.      I have.

6     Q.      For the record, is he present in the

7  courtroom today?

8     A.      He is.  He's seated next to counsel.

9          THE COURT:  The record reflects that the

10  witness has identified the defendant.

11    Q.      First of all in the course of your

12  investigation, have you checked Mr. Wynn's criminal

13  history to see if it -- if he has been previously

14  convicted of a felony offense?

15    A.      I have.

16    Q.      Okay.  And has he been -- in fact, been

17  convicted of trafficking in controlled substances,

18  felony offenses on two separate occasions, and also

19  facilitation of robbery, a third felony; is that

20  correct?

21    A.      He has, correct.

22    Q.      From, from the Court records of those

23  convictions, is it apparent that Mr. Wynn is aware of

24  the fact that he has been convicted of these three

25  offenses?

1    A.    It is.

2    Q.    Can you tell the members of the Court what

3 you'd learned occurred on August 28, 2020, in

4 Covington, Kenton County, Kentucky.

5    A.    On August 28, 2020, Mr. Wynn was driving a

6 vehicle on Howard Litzler near Madison Avenue.  He was

7 the sole occupant of the vehicle.  And the vehicle was

8 being driven outside the lane of traffic on the

9 shoulder.

10        An officer from Covington police department,

11 Officer Brad Morris, conducted a traffic stop of

12 Mr. Wynn, and based on his stop, very quickly

13 suspected that driving under the influence was a

14 possibility.  So he contacted Officer Roark with the

15 Covington police department, who at the time was

16 dedicated to dealing with suspected DUIs as the other

17 officers may encounter them.

18    Q.    At some point in time, did the officer on

19 the scene detect the smell of marijuana from the

20 vehicle?

21    A.    They did.  When Officer Roark arrived, he

22 began speaking to Mr. Wynn.

23        He then asked Mr. Wynn to step out of the

24 vehicle, and detained him.  He then explained to

25 Mr. Wynn that he smelled marijuana coming from the

1  vehicle.  And soon after, he began a pat down of

2  Mr. Wynn.  He located a bag in his pocket.  And when

3  he asked Mr. Wynn what that was, Mr. Wynn referred to

4  it as a bag of weed.

5       Q.     A bag of weed?  That's common for

6  marijuana; is that correct?

7       A.     Correct.

8       Q.     Ultimately, was that bag recovered from

9  Mr. Wynn's person?

10       A.     It was.

11       Q.     Can you give the Court -- tell the Court

12  what it contained.

13       A.     The bag contained suspected marijuana in

14  that bag that was in his front pants pocket.

15       Q.     And were there additional quantities of

16  controlled substances seized from Mr. Wynn's person?

17       A.     There were.  During the pat down Mr. Roark

18  the officer from Covington, was dealing -- discovered

19  what he immediately recognized to be a controlled

20  substance that was concealed in Mr. Wynn's underwear

21  or pants.

22            Struggle and resisting ensued, and Mr. Roark

23  -- Officer Roark was unable to get that out of

24  Mr. Wynn's pants with Mr. Wynn's compliance.  So he

25  actually had to go back to his police cruiser and he

1  got a pair of medical sheers and he had to cut

2  Mr. Wynn's underwear off of him from inside of his

3  pants, remove those underwear, and then he located a

4  plastic bag with a white powdered substance in the --

5  I guess you would describe it as the pass-through of

6  the underwear.

7      Q.      And was that substance recovered and sent

8  to the laboratory for analysis?

9      A.      It was.

10     Q.      Okay.  And with regard to when they took

11 that particular bag, what did they find inside of it?

12     A.      Inside of that bag was two separate bags

13 containing the same or similar substance, and the

14 entire bag was sent to the lab.  The lab weighed both

15 bags, tested only the larger of the bags, which is

16 their procedure, and found that that substance

17 contained cocaine.

18     Q.      And that was approximately a little over

19 nine grams of cocaine; is that correct?

20     A.      Correct.

21     Q.      And the second bag with the similar

22 substance, that was not initially tested, has that

23 been resubmitted to the lab to be tested as well?

24     A.      It has.  Both, both quantities of the

25 white powder, as well as the suspected marijuana, have

1  been resubmitted to the lab.

2      Q.      Thank you.  First of all, the -- in

3  addition to that particular -- eventually, Mr. Wynn

4  was arrested pursuant to the discovery of these items;

5  is that correct?

6      A.      Correct.

7      Q.      Okay.  Was a search performed incident to

8  arrest of the vehicle that Mr. Wynn was driving and

9  was the sole occupant?

10     A.      It was.

11     Q.      Okay.  And can you outline for the Court

12 the items of significance that were found during the

13 search.

14     A.      They located a digital scale in the center

15 console.  They also located a loaded firearm in the

16 glove box.  The glove box was locked at the time.

17 There was a key on a lanyard around Mr. Wynn's neck,

18 and that key opened the glove box where they located

19 the loaded firearm.

20     Q.      First of all, let's talk about the loaded

21 firearm in the glove box.  Was that firearm submitted

22 for testing to see if it contained DNA?

23     A.      It was.

24     Q.      And ultimately, did police obtain a DNA

25 sample from Mr. Wynn pursuant to a search warrant?

1      A.      They did.

2      Q.      What were the results when they compared

3  the grip area of the loaded firearm in the glove box

4  to Mr. Wynn's DNA?

5      A.      The lab described it as very strong

6  support that Mr. Wynn's DNA was present on that

7  firearm.

8      Q.      Literally it was millions of times more

9  likely that Mr. Wynn was a contributor to the DNA than

10  a third person; is that correct?

11      A.      I believe it was 160 trillion times more

12  likely that Mr. Wynn was a contributor, along with two

13  additional unknowns, than it was that it was three

14  unknowns.

15      Q.      So this loaded firearm was found in the

16  glove -- in the glove box of the vehicle Mr. Wynn was

17  operating.  Mr. Wynn had the key around his neck,

18  correct?

19      A.      Correct.

20      Q.      In addition to that, was there a search

21  ultimately done of the trunk of the vehicle that

22  Mr. Wynn was driving?

23      A.      There was.

24      Q.      Okay.  Can you outline to the Court the

25  significant items that were found in the trunk.

1    A.    In the trunk officers located a -- what

2  they described as a backpack.  Inside of that backpack

3  was a cellphone and another loaded firearm.

4    Q.    First of all as to this second loaded

5  firearm that was in the backpack, was --

6  (indiscernible) -- was that submitted to testing to

7  see if it contained DNA?

8    A.    It was.

9    Q.    And with regard to the -- was there a

10 comparison made between the -- I think it's called the

11 hammer, slide, trigger area of that firearm and the

12 known sample of DNA for Mr. Wynn?

13   A.    There was.

14   Q.    And what were the results of that?

15   A.    Those results -- again, the language they

16 used is very strong support for the presence of

17 Mr. Wynn's DNA.  I believe the actual number for that

18 was that it was three quadrillion more likely that the

19 sample contained Mr. Wynn's DNA than that it contained

20 unknowns.

21   Q.    You also mentioned a cellular phone being

22 located inside the backpack.  Was a search warrant

23 executed for the contents of the cellular phone?

24   A.    It was.

25   Q.    Have you reviewed the contents of the

1  cellular phone?

2      A.      I reviewed the contents of the download,

3  yes.

4      Q.      Of the download?

5      A.      Correct.

6      Q.      First of all, from, from reviewing the

7  contents of the download, did they indicate to you --

8  give any indication to you as a drug investigator who

9  used that phone on a regular basis?

10     A.      It did.  The, the phone has multiple

11 accounts registered to it, different email accounts

12 and things that that phone is registered to.

13         The iCloud account directed to the phone is

14 under the name of Bogie Houdini.  I know from

15 different text messages, as well as what Mr. Wynn

16 refers to himself in the recorded jail calls that he's

17 made is that he goes by Bogie as a, I suppose a

18 nickname.

19         There's also accounts with the email attached

20 to the phone being Anthony Wynn with different numbers

21 and things attached to each account name.

22     Q.      Were there photographs of Mr. Wynn in that

23 phone that drew your attention?

24     A.      There were.  There was photographs and

25 videos of Mr. Wynn in that phone.

1    Q.    And do any of them contain Mr. Wynn with

2    firearms?

3    A.    There are several that contain what appear

4    to be selfie-type of videos or photographs of Mr. Wynn

5    with firearms.

6    Q.    Did you also look through the messages on

7    that particular phone to see if there were any

8    messages consistent with drug trafficking based on

9    your training and experience?

10   A.    I did.

11   Q.    And did you locate any such messages?

12   A.    I did.  I located multiple messages that

13   appear to be people placing orders for drugs or

14   discussing the quality or type of drugs that Mr. Wynn

15   had on hand at the time.

16   Q.    Based on the amount of controlled

17   substances that were found -- the -- Mr. Wynn's

18   history of trafficking in controlled substances, the

19   messages in his phone, the presence of loaded

20   firearms, were those things, based on your training

21   and experience, consistent with someone engaged in

22   distribution of a controlled substance as to -- as

23   opposed to mere possession of a controlled substance?

24   A.    They are.

25   Q.    Okay.  In addition, the presence of the

1  loaded firearms both in the glove compartment and in

2  the -- in the glove compartment where the vehicle was

3  being operated containing controlled substances, in

4  addition in the trunk also being loaded and in the --

5  with the, with the phone used to convey drug messages,

6  are those consistent with the possession of those guns

7  in furtherance of drug trafficking?

8      A.      They are.

9      Q.      With regard to both of the firearms, based

10 on your training and experience in investigation, have

11 you obtained a permission as to whether those firearms

12 have traveled in interstate commerce?

13     A.      They have.

14         MR. BRACKE:  No further questions at this

15 time.

16         THE COURT:  Thank you, Mr. Bracke.

17         Mr. Neff, how about you?

18         MR. NEFF:  Just a moment, Your Honor.

19         THE COURT:  Sure.  Sure.

20         Lynn, would you go ahead and turn on the

21 white noise for a moment.

22         Ready?  Okay.

23                    CROSS-EXAMINATION

24     BY:  MR. NEFF:

25     Q.      Agent Price, can you hear me okay?

 1      A.      Yes, sir.

 2      Q.      So the, the original stop of Mr. Wynn,

 3 according to the affidavit, was that he, he crossed

 4 the line and went into the emergency lane; is that

 5 correct?

 6      A.      No, sir.

 7      Q.      Went out of lane?

 8      A.      No, sir.  He was traveling down the

 9 shoulder of the road.

10      Q.      The shoulder?  Okay.

11      A.      Uh-huh (affirmatively).

12      Q.      Okay.  So he had crossed the line on the

13 right side; is that the shoulder?

14      A.      Correct.  He had crossed the line and was

15 traveling in both -- the shoulder there's not large

16 enough for a vehicle.  He was traveling in both the

17 shoulder -- most of the shoulder and a bit of his

18 lane.

19      Q.      Okay.  So his car would be straddling the

20 right line -- the right lane line?

21      A.      Correct.

22      Q.      There would be MVR video of that; is that

23 correct?

24      A.      There -- I don't know if there's dash cam

25 video of Mr. Morris when he makes the stop.  There is

1  -- I have reviewed the video of Mr. Morris when the

2  vehicle is coming to a stop, and he gets out and

3  approaches him and discusses it with him.

4      Q.    And that's from the officer who pulled him

5  over who was behind him?

6      A.    Correct.

7      Q.    Okay.  Is that the same officer who

8  initially observed Mr. Wynn's car straddle the line?

9      A.    It is.

10      Q.    Okay.  So then that video should include

11  the straddling of that line, correct?

12      A.    Correct.

13      Q.    I'm going to bounce around a little bit

14  here.  Hopefully, you can follow me.

15      The, the drugs that were obtained from

16  Mr. Wynn are alleged to obtain -- you have lab reports

17  for both of those now or only one?

18      A.    Only one.  So the, the -- there was a

19  single bag containing a white powdered substance that

20  was submitted to the lab.  Once it arrived at the lab,

21  the lab determined it was actually a bag containing

22  two separate amounts of a powdered substance separated

23  by an additional bag.  They tested only the larger, as

24  is their policy.

25      Q.    And that came back as powder cocaine?

1    A.      It came back as testing for the presence

2  of cocaine.

3        They -- it's been resubmitted now, and they

4  will now test for the presence of all of the items, as

5  well as for cocaine base.

6    Q.      Okay.  And the second bag, you do not have

7  a lab report on that yet; is that correct?

8    A.      Right.

9    Q.      But your -- I guess your affidavit says

10  visually that both drugs appear to be the same?

11    A.      They appear to be identical.

12    Q.      Okay.  Now, Mr. Bracke asked you about

13  Mr. Wynn's criminal history, and you indicated that

14  there were two trafficking in a controlled substance

15  felony convictions and one facilitation of a robbery

16  conviction.  Are those three separate convictions; do

17  you know?

18    A.      Yes, there are.  I believe that there was

19  a single conviction date where Mr. Wynn pled guilty to

20  three separate counts of drug trafficking, but there

21  an additional date unrelated to that as well.

22    Q.      Where he pled guilty to what?

23    A.      To a drug trafficking as well as a

24  facilitation of robbery, and all those three being

25  three separate events.

1    Q.    Okay.  So if you -- were those all in

2 Kenton County?

3    A.    I can't recall what county they were all

4 in.

5    Q.    Okay.  Were they all in northern Kentucky?

6    A.    I, I know some of them were in northern

7 Kentucky.  Some may have been in Hamilton County,

8 Ohio.  I'm not sure.

9    Q.    All right.  The ones that were in

10 Kentucky, have you reviewed the videos of those

11 hearings?

12    A.    The videos of the hearings?

13    Q.    Yeah, the record.

14    A.    No.

15    Q.    No?  Okay.  So you don't know for certain

16 that Mr. Wynn was actually there?

17    A.    All of the court documents and the

18 judgment filed shows that it was Mr. Wynn that was

19 there and Mr. Wynn that pled guilty.

20    Q.    Okay.  So if you haven't looked at the

21 videos, and you, you don't know what Mr. Wynn knew if

22 he was there, correct?

23    A.    I don't fully understand the question.

24    Q.    Okay.  So you don't know if he was advised

25 that he could no longer possess -- legally possess a

1 firearm?

2      A.      I, I was not present, no.

3      Q.      Okay.  And in the documents that you

4 reviewed, you haven't seen that language -- that

5 prohibition in any of the documents you reviewed, have

6 you?

7      A.      I have not.  I've only reviewed the

8 judgments.

9      Q.      Okay.  So as you sit here today, you --

10 you cannot state that you are certain that Mr. Wynn

11 was aware that he was prohibited from legally

12 possessing a firearm?

13      A.      Mr. Wynn has made statements in jail calls

14 that tell me that he knew he was aware that he was not

15 legally allowed to possess a firearm.

16      Q.      Okay.  So you're taking me to jail calls.

17 So there are jail calls that exist in this case as

18 evidence?

19      A.      There are.

20      Q.      Okay.  And they've been provided to the

21 United States Attorney as discovery in the case?

22      A.      Not yet, no.

23      Q.      Okay.  But they will be discovery in the

24 case?

25      A.      Yes.

1    Q.      Now, the phone, is it one phone that you
2  recovered or is there multiple phones?
3    A.      Only one phone was recovered.  When
4  Mr. Wynn was initially encountered, he had a phone on
5  his person, and at some point in the struggle, or in
6  the collection of the items on the street and off the
7  side of the road, that phone was lost by Covington
8  P.D.
9         The phone that I have reviewed the download
10  for was the phone located in the trunk in the
11  backpack.
12    Q.      So then there would have been at least two
13  phones, one that was lost and one that was in the
14  trunk?
15    A.      Correct.
16    Q.      And the one that was in the trunk is the
17  one you obtained a search warrant to, to search?
18    A.      I didn't obtain the search warrant, no,
19  sir.
20    Q.      Did, did someone obtain the search
21  warrant?
22    A.      Yes, a search warrant was obtained, yes.
23    Q.      Okay.  And have you seen that search
24  warrant?
25    A.      I have.

1    Q.    Okay.  So that'd be part of discovery in
2  this case?
3    A.    It will.
4    Q.    The one that was lost on the side of the
5  road, that was not recovered?
6    A.    As far as I know, it was not recovered.
7  It's not been entered as evidence.  If it is -- if it
8  has been recovered by someone, no one has known that
9  it was linked to Mr. Wynn or this case in anyway.
10    Q.    Okay.  Well, the only way that you would
11  know that it was lost was if an officer knew it
12  existed and saw it disappear, correct?
13    A.    The color of the phone that Mr. Wynn has
14  in his hand in the video does not match the color of
15  the phone that was located in the trunk.
16    Q.    Okay.  But you've made the statement that
17  it was lost in the struggle.  How, how do you know
18  that?
19    A.    I don't know exactly how.  I know that
20  soon after he was detained -- he had the phone in his
21  hand, he was detained, there was a struggle, and
22  ultimately when all the officers left the scene and
23  logged all the evidence, it was not present.
24    Q.    Okay.  So it's not your testimony that an
25  officer saw the phone --

1    A.    No.

2    Q.    -- and discharged or threw it or

3  something?

4    A.    I have, I have no idea where the phone is

5  located.

6    Q.    The DNA you referred to, I presume that

7  there are lab reports already back on the DNA, or you

8  wouldn't have those numbers, correct?

9    A.    They are.

10    Q.    Okay.  Are they in discovery in this case,

11  or will be?

12    A.    They will be, yes.

13    Q.    So you -- the original traffic stop did

14  not involve you, correct?

15    A.    Correct.

16    Q.    But you've looked at the video, the dash

17  cam or MVR video?

18    A.    The body cam with that officer, yes, sir,

19  but I've watched the video.

20    Q.    Is that Covington or Ft. Wright?

21    A.    Covington.

22    Q.    Covington.  So that body cam will be in

23  discovery as --

24    A.    It will.

25    Q.    And then you reviewed -- you say you

1 reviewed that and you also reviewed all the reports

2 that the officer wrote from that stop, correct?

3     A.    I have.

4     Q.    Okay.  You indicated that there was -- it

5 was a stop initially for crossing the line and

6 suspected DUI.  That was the initial reason for the

7 stop, correct?

8     A.    Correct.  Ultimately, Mr. Wynn was cited

9 with careless driving.

10     Q.    Okay.  And then the officer in his

11 citation, whatever, put down that there was a smell of

12 marijuana as he approached the car; is that right?

13     A.    I can't recall if that's written in the

14 citation.  It is, it is said on the body cam --

15     MR. NEFF:  Okay.

16     A.    -- I do know that for sure.  I can't

17 recall if it's in the citation or not.

18     Q.    And that's the reason for getting Mr. Wynn

19 out of the car?

20     A.    I, I don't know Officer Roark's reason for

21 getting Mr. Wynn out of the car.  I know he states

22 that once Mr. Wynn has been detained, but he didn't

23 verbalize his reason for getting him out of the car

24 prior to asking him to step out as far as Mr. -- or

25 officer Roark was called there for a suspected DUI.  I

1  don't know if him asking him to step out was related
2  to that or related to the smell or both.
3      Q.     Okay.  But they would not have --
4  certainly would not have found the suspected drugs in
5  his underwear prior to getting him out of the car,
6  correct?
7      A.     Again, I don't know Mr. -- or Officer
8  Roark stated that immediately upon him getting out of
9  the car, that he smelled marijuana in the vehicle, so
10 I don't know if he had already smelled it prior to
11 Mr. Wynn getting out of the car or not.
12     Q.     Okay.  Let's move on to the digital scale.
13 You said that was in the console?
14     A.     I believe so, yes.
15     Q.     You've reviewed the body cam of the
16 officer?
17     A.     I reviewed the body cam, yes.
18     Q.     Okay.  That scale was not in plain site,
19 correct?  It was inside a console with a lid on it?
20     A.     I don't know where the scale -- I don't
21 know where they -- you cannot see them retrieve the
22 scale initially.  You just see it in their hands, so
23 it's dark inside the car and their body cam's on their
24 chest, so often, you can't see what they're looking at
25 versus what's on the camera.

1        MR. NEFF:  All right.

2    A.    There's also a body cam of several

3 officers, so I can't recall exactly every bit of that

4 at this time.

5    Q.    But you don't recall seeing that -- any

6 video where the scale was in plain site from outside

7 that car?

8    A.    No.

9    Q.    Okay.  If it were not in plain site, that

10 would mean the officers would have to open the console

11 to find it, correct?

12    A.    Correct.

13    Q.    Okay.  The other thing is that there was a

14 gun found in the glove compartment or the glove box,

15 correct?

16    A.    Correct.

17    Q.    And that glove box was locked?

18    A.    It was.

19    Q.    Okay.  Did Mr. Wynn give consent to

20 someone to take the key off his neck and open that

21 glove box?

22    A.    He did not.

23    Q.    Was there a search warrant to open that

24 glove box?

25    A.    There was not.

```
 1      Q.      Okay.  Mr. -- at that time, Mr. Wynn was
 2  out of the car before the glove compartment would have
 3  been open, correct?
 4      A.      Correct.
 5      Q.      So there was not an issue with him being
 6  able to get to that glove compartment, correct?
 7      A.      No.
 8      Q.      Okay.  And so the officer would not have
 9  been concerned about his safety at that point in time?
10      A.      When he was --
11          MR. BRACKE:  Objection.  I don't know what
12  the officer's concern would be.  I don't think -- I
13  don't think Agent Price can testify what the officer
14  was concerned about.
15          THE COURT:  Well, it's not a suppression
16  hearing.
17          MR. NEFF:  Fair enough.
18          THE COURT:  Do you want to rephase --
19  rephrase?  Sustained.
20      Q.      So as far as you know, they took the key
21  off Mr. Wynn's -- was -- you said it was on a lanyard?
22      A.      Correct.
23      Q.      So it was around his neck.  Could you see
24  that in the video?
25      A.      Yes.
```

1  Q.  Okay.  So they took it from around his

2 neck and opened the glove compartment?

3  A.  Correct.

4  Q.  And as far as you know, from watching the

5 video and reviewing documents, Mr. Wynn never gave

6 consent to open that glove compartment?

7  A.  Correct.

8  Q.  Okay.  The same thing with the trunk; I'm

9 assuming it was locked as well?

10  A.  It was closed, so it was either latched or

11 locked.  I'm not sure.

12  Q.  Okay.  But someone would have to do

13 something to open the trunk, correct?

14  A.  Correct.

15  Q.  Either use a key or pull the switch -- the

16 lever inside the car?

17  A.  Correct.

18  Q.  In the videos, did you see Mr. Wynn give

19 consent for them to search the trunk?

20  A.  No.

21  Q.  To your knowledge, you know, this case

22 goes back a couple years, right?  It was started off

23 in Kenton County --

24  A.  Correct, yes.

25  Q.  -- Circuit Court?  Have you been involved

1  in the case from its inception?

2      A.      No.

3      Q.      Okay.  Have you looked at records of the

4  case from its inception?  For example, do you know

5  from citations and reports that the officers would

6  have written up?

7      A.      Yes.

8      Q.      Are there any -- well, was -- do you --

9  are you aware, was there a preliminary hearing held in

10 Kenton County Circuit Court?

11     A.      I don't -- I assume there was.  I don't

12 know.

13     Q.      You haven't seen a video of that?

14     A.      I have not.

15     Q.      Okay.  Are there any indications or do you

16 have any knowledge of any interviews of Mr. Wynn in

17 this case?

18     A.      No.

19     Q.      All right.  Any written statements of him

20 in this case?

21     A.      No.

22     Q.      Was there anyone else with him in the car?

23     A.      No.

24     Q.      So the recordings that would be used to

25 support your testimony would be the body cam, dash

1  cam, if it exists, from Covington or whatever other

2  agency there is, recorded jail calls, is there any

3  other audio or video recordings that would exist here?

4      A.      There's audio and video recordings on the

5  cellphone.

6      Q.      Things that were found during the search

7  of the phone you mean?

8      A.      Correct.

9          MR. NEFF:  Okay.  Judge, could I have just

10 one moment, please?

11         THE COURT:  You may.

12     Q.      Agent Price, I think I just have one more

13 question, maybe two.

14         At what point in time -- if you've already

15 answered this, I apologize, but I didn't catch it --

16 at what point in time did you get involved in this

17 investigation?

18         MR. BRACKE:  Objection as to relevance.

19         THE COURT:  Overruled.

20     A.      I believe it was approximately March of

21 '22, 2022.  It may have been April.  I'm not sure.

22     Q.      So that's five months ago, four months

23 ago?

24     A.      Approximately, yes, sir.

25     Q.      Okay.  So it indicates it's been going on

1  for maybe two years prior to that or a year and a half

2  prior to that?

3       A.      However long -- yeah, whatever the math is

4  between August and then.

5       Q.      And you weren't involved in this case

6  prior to March of 2022?

7       A.      Not at all.

8            MR. NEFF:  All right.  Judge, I have no

9  further questions.  Thank you.

10           THE COURT:  Okay.  All right.  Mr. Bracke, do

11 you have any follow-up?

12           MR. BRACKE:  No, Your Honor.

13           THE COURT:  All right.  You may step down,

14 Agent Price.  Thank you.

15           And then, Mr. Bracke, do you have any other

16 witnesses?

17           MR. BRACKE:  We rest.

18           THE COURT:  All right.  Thank you.

19           Mr. Neff, how about you on behalf of the

20 defendant, do you have any witnesses you wish to call

21 at the preliminary hearing?

22           MR. NEFF:  Judge, for purposes of the

23 preliminary hearing, we do not have any witnesses to

24 present.

25           THE COURT:  Okay.  All right.

1           All right, gentlemen, would you -- would you

2    like to submit based upon the testimony or do you wish

3    to make a further presentation?

4           Mr. Neff?

5           MR. NEFF:  Judge, I'll certainly submit on

6    the testimony.

7           THE COURT:  Okay.

8           MR. NEFF:  And again, just remind the Court

9    that we want to reserve on the detention hearing

10   issue.

11          THE COURT:  I understand.

12          And then, Mr. Bracke, how about you, sir?

13          MR. BRACKE:  We're willing to submit on the

14   testimony.

15          THE COURT:  Okay.  All right.  All right.

16          So, Mr. Wynn, with respect to -- now, this is

17   specifically with respect to the preliminary hearing

18   process that we have just completed, I do find now

19   that the hearing portion is closed and each side has

20   offered what evidence they wish to, specifically with

21   regard to a preliminary hearing, the Court is tasked

22   with determining whether there is probable cause to --

23   to support each of the charges that have been

24   presented against you in this criminal complaint.

25   Probable cause is, of course, a standard that is very

1  different than proof beyond a reasonable doubt, which

2  is what goes before a jury if someone is indicted.

3         With respect to probable cause, there are

4  three charges that have been presented against you,

5  possession of a firearm by a convicted felon,

6  possession of a firearm in furtherance of drug

7  trafficking, and possession of cocaine with intent to

8  distribute.

9         Now, with respect to each of those three

10 charges, I was taking notes as Agent Price testified,

11 primarily for the purpose of looking to see, because

12 he is the only one who has testified in this matter,

13 and looking to see if he has offered by way of his

14 testimony the necessary information with respect to

15 the elements that would go into each of those counts,

16 and I do find that he has offered sufficient

17 information with respect to the elements for each of

18 those three charges.

19        Now, when I say "sufficient information,"

20 that is basically the probable cause showing.

21        So I am concluding that that has been

22 reached -- but -- it has been made, shown by the

23 United States.

24        Now, let me tell you what that finding by the

25 Court does not mean.  To the extent that you have

never been involved -- I don't know if you have or
not, a probable cause hearing before -- but that is
not a finding of guilt.  That has nothing to do with
whether or not you actually committed by proof beyond
a reasonable doubt each of these three charges that
had been presented in the criminal complaint.

A probable cause finding by this Court at
this point just simply means that the matter moves
forward to a grand jury, and the grand jury has to
make their own separate probable cause finding in
order to return an indictment against you.

So I am going to bind the matter over to the
grand jury, and then they will at the next grand jury
session, whenever the government presents that to
them, they will make their own finding in that
respect.

Just based on some of the questions that were
asked here, I do think it's important to note --
again, you may already be aware of it, Mr. Wynn, but
the -- the regular rules of evidence that would
prevail at a trial that the judge would have to apply
at a trial before a jury, those don't apply in
preliminary hearing circumstances, which it's one of
the reasons why Agent Price, for example, can talk
about what's called hearsay evidence based on

1  investigation that's been done by other officers and

2  so forth.  So the regular rules of evidence don't

3  apply to the preliminary hearing process.

4       Some of the questions that were asked by your

5  counsel -- and this is a common occurrence -- but they

6  sounded a bit more like questions that perhaps would

7  come up if a suppression motion is filed in a case.

8       So the Court's finding of probable cause is

9  not a finding of -- or in any way precludes a

10  defendant if a case moves forward from challenging in

11  other ways, evidence that may be used by the

12  government at trial.

13       So there may be an opportunity if the case

14  does move forward and the grand jury returns an

15  indictment, if Mr. Neff needs to bring up such matters

16  on your behalf after you and he have reviewed

17  discovery and talked about it, you'll have an

18  opportunity to do so.  The preliminary hearing does

19  not in any way waive your right to present

20  constitutional challenges if you believe that those

21  are appropriate.

22       But for today's purposes, that is the finding

23  of the Court.  I do believe that each of the necessary

24  elements through the testimony of Agent Price has been

25  shown sufficient for probable cause circumstances

1  specifically, so this matter will be bound over.

2       Now, I'll have to wait to see what the grand

3  jury does.  If there is an indictment returned, you'll

4  be set for an arraignment proceeding.  I'll have you

5  back in front of me for an arraignment proceeding.

6  But in the meantime, I do want to give you and

7  Mr. Neff sufficient time so that he can do what he

8  needs to do to prepare for a detention hearing for

9  you.

10      Mr. Neff, what are you thinking in the way of

11 time?  And I actually did not bring my calendar out

12 here with me, but we'll get something set for you, but

13 how much time would you like to have?

14      MR. NEFF:  Judge, I was originally thinking

15 that I would just file a motion with the Court to

16 trigger another detention hearing.  However, I presume

17 that we're still on the schedule of that Campbell

18 County comes over on Tuesdays; is that, is that right?

19      THE COURT:  That's correct.  And I may, I may

20 have misunderstood what you were originally asking

21 then.

22      Are you, are you asking for a general

23 continuance at this time to see what the grand jury

24 does and then re-raise the issue of detention after

25 you and your client have had a chance to go through

1  the details of this report?

2          MR. NEFF:  Well, judge, I wasn't real

3  specific about that.  What I need was I needed enough

4  time for Mr. Wynn to go through his pretrial report

5  and tell me that it's accurate, and if it's not, allow

6  me to advise the Court what we disagree with.

7          THE COURT:  Okay.

8          MR. NEFF:  I'm going to have to review some

9  documents, and I may have to talk to Ms. Vonderhaar

10  about some information.

11          THE COURT:  That's fine.

12          MR. NEFF:  I think if the Court were willing

13  to put it on next Tuesday, I should be able to

14  accomplish that.

15          THE COURT:  Which is, I think, the 2nd,

16  August 2nd?

17          MR. NEFF:  The 2nd, August 2nd, yes.

18          I'm in front of Judge Bunning at 9:30 and 10

19  that morning.

20          THE COURT:  Okay.

21          MR. NEFF:  So I could be available any time

22  of the day after that.

23          THE COURT:  And, Madam Clerk, if you would --

24  you're already doing it, thank you so much -- pull up

25  the 2nd for me and see what I already have scheduled

1   for that day on the court calendar.

2          And while she's checking that, Mr. Bracke, is

3   there any objection by the United States to

4   continuance of the detention hearing until the 2nd?

5          MR. BRACKE:  No, Your Honor.

6          THE COURT:  Okay.

7          COURTROOM DEPUTY:  You have nothing.

8          THE COURT:  Great.  Then we can set it down

9   for, how about for 1:30 on Tuesday, August 2nd?

10          MR. NEFF:  Thank you, Your Honor.

11          THE COURT:  Does that work for you?

12          All right.  And that's -- that's acceptable

13   to the United States?  Mr. Bracke, are you available

14   then?

15          MR. BRACKE:  Yes, Your Honor.

16          THE COURT:  Okay.  All right.  So we will --

17   at minimum, we'll continue the detention hearing for

18   you, Mr. Wynn, to next Tuesday.  I'll see you back

19   then, and we will take up that detention hearing

20   process for you.  And then we'll wait to see what

21   happens with respect to any grand jury presentation.

22   But we'll at least conduct that detention hearing and

23   go from there.

24          All right.  Anything further that we need to

25   take up on this matter for today's purposes?

1          Mr. Neff, anything further on behalf of
2    Mr. Wynn?

3          MR. NEFF:  I don't believe so.  Thank you.

4          THE COURT:  Okay.  And, Mr. Bracke, how about
5    you, sir, anything further by the United States?

6          MR. BRACKE:  No, Your Honor.

7          THE COURT:  All right.  Thank you all for
8    your attention here today.  At this time, our
9    proceeding is concluded.

10          Mr. Wynn is remanded to the Marshal's
11   custody, and I'll see you next Tuesday, sir.

12          Thank you.

13          *[END OF PROCEEDINGS – 1:58:19 p.m.]*

14                     * * * * *

15          I,  Sandra L. Wilder, do hereby certify that
16   the foregoing is a true, correct and complete
17   transcript of the digitally-recorded proceedings in
18   this matter, recorded on July 26, 2022, and
19   transcribed from the digital recording, to the best of
20   my ability to hear said recording, and that said
21   transcript has been compared with the digital
22   recording.

23               */s/ Sandra L. Wilder*
24               SANDRA L. WILDER, RMR, CRR,
25               COURT REPORTER       Date:  09/29/2022